Hillsborough, }
Jan. 2, 1940. } No. 3094.

### WANDA M. COOLEY

*v.*

### PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE.

*Chretien & Craig* and *O'Connor & Saidel* (*Mr. Saidel* orally), for the plaintiff.

*Demond, Sulloway, Piper & Jones* (*Mr. Jones* orally), for the defendant.

PAGE, J.   On November 29, 1935, the telephone company maintained a cable on Taylor Street, Manchester, running north and south. This cable consisted of a lead sheath, inside which were carried a large number of wires connected with the service stations of its subscribers.   The cable was supported by rings from a messenger wire strung on the telephone company poles.   The construction conformed to standard practices, and the messenger wire was grounded every thousand feet.   The sheath of the cable also was grounded.   The telephone company further maintained at the station which the plaintiff was using when she received her injuries, two protective devices for grounding foreign currents in order to prevent their entrance to the house and to the subscriber's instrument. There is no evidence that these devices did not operate perfectly.

At a point about a mile distant from the plaintiff's house, the Public Service Company's lines, east and west along Valley Street,

crossed the telephone cable at right angles and some eight or ten feet above it. These lines were not insulated.

Shortly after midnight, during a heavy storm, several of the Public Service wires over the intersection of Valley and Taylor Streets broke and fell to the ground. One of them came into contact with the telephone messenger. This particular wire of the defendant carried a voltage of about 2300. Consequently an arc was created, which burned through the messenger and nearly half through the cable before the current was shut off. This was effected automatically when the grounding of the high-tension current operated the defendant's circuit breaker. The time for this operation was brief. A witness who saw the wires fall testified that the fall was accompanied by a flashing and flickering that lasted two or three seconds. All house and street lights were extinguished. The plaintiff's brother was in the house with her at the time. Right after the crashing noise, soon to be mentioned, the lights flickered a few times and went out "around fifteen seconds after" the sound.

When the contact of the wires occurred, the plaintiff was standing at the telephone, engaged in a long-distance conversation. The contact created a violent agitation in the diaphragm of the receiver and a loud explosive noise. The plaintiff fell to the floor. She has since suffered from what her physicians describe as traumatic neurosis, accompanied by loss of sensation on the left side.

From the plaintiff's expert medical testimony it could be found that the neurosis was the result of fright or nervous shock induced by the noise. Though the plaintiff claimed during the trial that she suffered an electrical shock, there was not the least evidence that this was so, and the claim was specifically abandoned in the course of argument before us.

The medical testimony established the fact that neuroses are not common. Not all of them are traumatic in origin. One is called traumatic whether induced by an ordinary blow or by the impact of electric shock or noise. One physician had seen only three or four cases of traumatic neurosis in six years. Another had seen four or five or six in seventeen years. Some cases of neurosis, moreover, are associated with litigation. Neurosis as a result of noise is less common than that from electric shock. None of the doctors testified to having before seen such a case as this, though a telephone diaphragm will emit a loud sound in thunder-storms and at other times, as was shown in testimony. This might also be said to be a matter of common knowledge. (Parenthetically it may be said that, though

the jury could not know it, the testimony and common knowledge are consistent with experience as shown in reported cases. The industry of counsel, and our own, have discovered only one case of traumatic neurosis resulting from a noise in the telephone. That is *Fox* v. *Company*, 326 Pa. St., 420, a case nearly comparable to the present one.) It is incontestable that the neurosis with which we deal is very rare.

Apparently there is no claim that the negligence of the defendant caused the wires to fall. The plaintiff's sole claim is that the defendant could have anticipated (1) that its wire might fall for a variety of reasons, which is true; (2) that a telephone subscriber in such case might hear a great noise, which also is true; (3) that as a result of fright thereby induced the user of the telephone would suffer physical injuries, which, as we have seen, is a rare contingency, though it may be anticipated. It is urged that the defendant's consequent duty was to maintain such devices at cross-overs as would prevent one of its falling wires from coming into contact with a telephone wire.

The devices suggested are two. The first is a wire-mesh basket suspended from the poles of the defendant at the point of cross-over, above the cable and below the defendant's wires. Two forms were suggested. One would be about six by eight feet. The other would be of an unassigned width and would stretch the full distance between defendant's poles. In either case the basket would be insulated. The theory is that falling wires, though alive, would remain harmless in the basket.

In the earliest days of electical construction, it was supposed to be good practice to maintain guards in such a position. *Electric &c. Company* v. *Shelton*, 89 Tenn. 423; *Western &c. Company* v. *Thorn*, 64 Fed. 287; *State* v. *Railway*, 87 Wis. 72; *McKay* v. *Company*, 111 Ala. 337, 345. In 1901 there was a vague reference to such guards in *Ela* v. *Company*, 71 N. H. 1. But as yet it was not known "what method of guarding the wires shall be required . . . ; for it is not known to the law that any method now known will prove effective." *Block* v. *Railway*, 89 Wis. 371, 377. If guards were required, the duty lay equally upon telephone and lighting company. *Rowe* v. *Company*, 66 N. J. L. 19.

But almost immediately doubts found expression. There was a tendency to regard them as aggravating dangers, rather than avoiding them. *Heidt* v. *Company*, 122 Ga. 474 (1904); *Conrad* v. *Railway*, 240 Ill. 12; Curtis, Electricity, *s.* 508. This historical outline from the books is interesting in view of the testimony given to the jury.

One of the plaintiff's witnesses was highly in favor of guards, whether they are obsolescent or not. There can be no question that baskets and other guards have been used in the past. One witness, an employee of the defendant called by the plaintiff, said such a device had been abandoned "because it was a greater hazard than it was protection." An expert called by the Telephone Company said that the use of baskets is disapproved by the National Electric Safety Code.

Assuming that the first witness were to be followed and the other two, though uncontradicted, were to be disbelieved up to this point, there yet remains certain other undisputed evidence regarding the efficacy of baskets that could not be disregarded. It was testified by several witnesses that one can never foresee at what point a wire will break; and that when a taut wire snaps, it is impossible to tell how it will fall. Common knowledge compels the acceptance of that testimony.

The efficacy of the basket depends upon the wires falling wholly, or nearly wholly, within the basket. The wires, if thus retained, would remain alive until grounded or until the current was switched off. But it is highly speculative whether they would thus fall and thus remain.

It was testified without contradiction, and again the testimony commands belief, that in an ice-storm the basket might fall with its live wires and energize the telephone system. A wire might snap down clear of the basket and make contact with the cable. In no such instance would the telephone-user be protected from a loud noise. Or the wire, falling partly in the basket, might hang four feet from the ground, whereas but for the basket it would have gone to the ground. Consequently the circuit breaker would not operate, and people in the street would become potential grounds for a 2300 volt current. Anybody touching the wire inadvertently would forfeit his life as a circuit-breaker.

The situation is similar with respect to insulation of the defendant's wire. Here again, the suggestion was made in the alternative —complete insulation, or insulation only of the part of the wire over the cable. Here again, also, the evidence is undisputed as to what results might be expected, and it commands belief because it is identical with common knowledge. If an insulated light wire of the defendant's lay upon the telephone cable, there would probably be no frightening noise in an unhooked receiver.

But a wholly insulated wire might lie twisted in such fashion that

the current would not ground. Since the circuit-breaker would not operate, the wire would remain alive, becoming a threat to the life of any passer-by who inadvertently touched its end. If the wire were partly insulated, and the uninsulated end reached the ground, the circuit-breaker would operate and the wire go dead. But if it did not reach ground, it would become a ready agent for electrocution, since it could seek no ground through the telephone system. Finally, if the wire snapped so as to wind the free uninsulated end about the cable, the result would probably be what it was in this case. Where and how the wire will fly is a matter of guess. Consequently the telephone user would in some cases, but not all, have protection, while commensurately the man in the street might have less protection.

There was evidence that baskets and similar devices were used by the telephone company, some years ago, for the protection of their wires at cross-overs. But the verdict establishes its lack of duty thus to protect its customers in this particular instance. There was no evidence that electric light companies ever erected baskets or insulated wires in such situations, and there was positive evidence that standard construction practices do not require either. The plaintiff cannot claim that the defendant maintained a system less carefully devised than one conforming to accepted practice. It is conceded, however, that due care might require some device better than the usual one. *Sweeney* v. *Winebaum*, 84 N. H. 217, 218. If the plaintiff and persons in her situation could be isolated, and duties to others ignored, due care might require the use of such devices as are here urged. *Chiuchiolo* v. *Tailors*, 84 N. H. 329, 332.

But the same reasoning that would establish a duty to do so raises another duty to the people in the street, not to lessen the protective effect of their circuit-breaking device. *Chiuchiolo* v. *Tailors, supra.* (One cannot read the numerous cases of street-electrocution without the belief that the earlier use of automatic circuit-breakers would have avoided nearly all the deaths and injuries sustained. In the recent case of *Adams* v. *Company*, 120 N. J. (Law) 357, the circuit-breaker operated. The loss of two lives and other injuries was due to the careless act of a station-employee in deliberately throwing the current on after it was broken.)

In the case before us, there was danger of electrocution in the street. As long as the telephone company's safety devices are properly installed and maintained, there is no danger of electrocution in the house. The only foreseeable danger to the telephone subscriber

is from noise—fright and neurosis.  Balancing the two, the danger to those such as the plaintiff is remote, that to those on the ground near the broken wires, is obvious and immediate.  The balance would not be improved by taking a chance to avoid traumatic neurosis of the plaintiff at the expense of greater risk to the lives of others.  To the extent that the duty to use care depends upon relationship (*Garland* v. *Railroad*, 76 N. H. 556, 567), the defendant's duty of care towards the plaintiff is obviously weaker than that towards the man in the street.

The defendant's duty cannot, in the circumstances, be to both.  If that were so, performance of one duty would mean non-performance of the other.  If it be negligent to save the life of the highway traveler at the expense of bodily injury resulting from the fright and neurosis of a telephone subscriber, it must be equally negligent to avoid the fright at the risk of another's life.  The law could tolerate no such theory of "be liable if you do and liable if you don't."  The law does not contemplate a shifting duty that requires care towards A and then discovers a duty to avoid injury incidentally suffered by B because there was due care with respect to A.  Such a shifting is entirely inconsistent with the fundamental conception that the duty of due care requires precisely the measure of care that is reasonable under all the circumstances.  2 Restatement, Torts, *ss.* 291-295.

The duty to take precautions rests upon the rule of reasonable anticipation, even though that rule does not prevail as to damages once the duty appears.  *Bowley* v. *Duca*, 80 N. H. 548; *Brackett* v. *Corporation*, 87 N. H. 173.  If the duty to the man in the street be forgotten for the moment, the duty to the plaintiff would depend upon anticipation of bodily injuries because of fright at a noise.  Of a defendant in such case it is to be remarked that "the likelihood that his conduct will cause bodily harm involves two uncertain factors, the chance that his act will cause the [emotional] disturbance and the chance that the disturbance if it occurs will result in bodily harm."  2 Restatement, Torts, *s.* 306, comment *c.*  The chance of physical contact with a live wire in the street, with consequent electrocution, is much less remote and complicated than that.  It is clearly more foreseeable and is the controlling one of all the circumstances for present purposes.  In this particular case, it could not be found that it would be reasonable to neglect the protection of those more obviously at risk than the plaintiff.

It is not doubted that due care might require the defendant to adopt some device that would afford protection against emotional

disturbances in telephone-users without depriving the traveling public of reasonable protection from live wires immediately dangerous to life. Such a device, if it exists, is not disclosed by the record. The burden was upon the plaintiff to show its practicability. Since the burden was not sustained, a verdict should have been directed for the defendant.

Other exceptions therefore require no consideration.

*Judgment for the defendant.*

All concurred.